Christian, J.
These two causes were decided by the late Court of Appeals, which was constituted, and organized, under the laws of Congress known as the “ Eeconstruction Acts.”
*33 The decisions were pronounced, and the decrees entered in each case, after the admission of senators and representatives from the State of Virginia into the Congress of the United States.
• They are now before this court, upon a motion submitted under the second section of the act of the General Assembly, approved March 5th, 1870, commonly called the “ Enabling Act,” which is in the following words: “§2. All official acts heretofore done by any such officers, and otherwise lawful, are hereby declared as legal and binding as if they had been done by officers duly elected and qualified under the Constitution of this State: Provided, That any judgment,decree or order rendered or made by the Court of Appeals at the term thereof, commencing on the 11th day of January, 1870, shall be subject to the supervision and control of the Supreme Court of Appeals, to be organized under the Constitution, upon the motion or petition of any party to the cause for a rehearing; and such judgment, decree or order may be set aside and annulled, or affirmed, as to said Supreme court may seem right and proper; but twenty days notice of the time of making said motion or filing said petition shall be given to the opposite party,” &e.
The sole question now presented for our consideration, is whether the Legislature has the constitutional authority to confer upon this court the power to set aside, annul or affirm, “ as to this court may seem proper,” the decisions of the Court of Appeals established by the military authorities under the reconstruction laws of Congress.
The question thus presented, is one of the gravest import, because it directly involves the validity and constitutionality of a legislative act. It resolves itself into this simple enquiry, Is the act of the General Assembly, as expressed in the proviso contained in the second section above referred to, constitutional ?
*34 I premise by saying that prima facie, every act of tbe Legislature is constitutional; and, in a doubtful case, the question ought always to be solved in favor of the validity of the act. The power to declare a legislative enactment void, is one which the judge, conscious of the fallibility of human judgment, will always shrink from exercising in any case where he can conscientiously, and with due regard to duty and official oath, decline the responsibility. The legislative and judicial are coordinate departments of the government, of equal dignity. Each is alike supreme in the exercise of its proper functions, and cannot directly or indirectly, while acting within the limits of its authority, be subjected to the control or supervision of the other. The courts may, in a proper case, and must, when the question is free from doubt, declare legislative enactments unconstitutional and void. It is not, however, because the judicial power is superior in degree and dignity to the legislative; but, being required to declare what the law is, in cases which come before them, the courts must enforce the constitution, as the paramount law, whenever a legislative enactment comes in conflict with it. 18 Wend. R. 53; 7 Ind. R. 334.
In exercising this high authority, the courts claim no supremacy over the Legislature. They are only the administrators of the public will. If an act of the Legislature is held void, it is not because the courts have any control over legislative power, but because the act is forbidden by the constitution, and because the will of the people, therein declared, is paramount to that of their representatives, expressed in any law. The power, however, is a delicate one, and is always exercised with reluctance and hesitation. But it is a duty which the courts, in a proper case, are not at liberty to decline, but must firmly and conscientiously perform.
Eully recognizing the force of these general princi *35 pies, and distrusting my own judgment (because I differ with some of my brethren), I proceed to state the reasons which force me to the conclusion, that the proviso contained in the second section of the act approved March 5th, 1870, is unconstitutional, and, therefore, inoperative and void.
How, if it can be shown that the decisions of the late Court of Appeals, which we are called upon to review, were, in law, valid, judicial acts, it will be easy to ■demonstrate that any attempt on the part of the Legislature to reopen these decisions, by conferring authority upon this court to re-hear and review them, is an exercise of judicial power which is forbidden by the ■spirit and letter of the constitution.
Let us consider, the.n, first, were these decisions valid as judicial acts ? or, in other words, were they rendered by a tribunal having the authority to make them ? It is undoubtedly true, that the laws of Congress, known as the reconstruction acts, subjected this •State to the military authority of the''’United States. The constitution under which we now live, and under which the legislative, executive and judicial departments of the government were organized, was inoperative, by the express terms of the reconstruction laws, until approved by the Congress of the United States. Under these laws, whose authority is recognized by ■every department of the State government, because all are organized and acting under them, the late judges of the Court of Appeals were appointed and installed in office. They were not mere usurpers, and did not intrude themselves into the office and attempt to exercise its high functions without color of authority. Their authority, whether valid or not, was derived from the laws of Congress. Their official acts as a Court of Appeals have been acquiesced in, recognized and made valid, if legislative action was necessary to make them valid, by the act of the Legislature now under consider *36 ation; for, by that act, they are declared to be “ as legal an<^ binding as if they had been done by officers duly elected and qualified under the constitution of their State,” except only such decisions as were rendered at the “ term commencing on the 11th day of J anuary, 1870.-
The counsel for the petitioners do not assail the decisions of this tribunal, upon the ground that they acted without authority, as judges of the Court of Appeals exceP^ to this extent, that they had no authority to act after the restoration of the civil government, w^c^-was accomplished on. the 26th day of January, 1870, by the admission of senators and representatives from this State into the Congress of the United States. But the position is taken, and the argument is pressed with great earnestness and much plausibility, that on that day the reconstruction acts, by their own terms, became inoperative, and that there was a complete restoration of the civil, and instant termination of the military government under which these] judges had received their appointments; that they were but the creatures of the military government, and when that government expired by the restoration of the civil, every office at once became vacant; and those persons who were then exercising their respective functions had no authority to perform any official act; consequently, it was competent for the Legislature to submit to the court appointed under its own authority, the causes decided by the court which preceded it, rendered after the 26th day of January, 1870. These are the grounds succinctly but fairly stated, upon which it is insisted that this court must now assume the right to rehear and review the causes finally disposed of by its-immediate predecessors, “ and annul, set aside, or affirm the same, as to this court may seem proper.
If the right to rehear and review these decisions can be maintained at all, it can only be done on these *37 grounds, for if it be admitted that these decisions are valid judicial acts, rendered by a tribunal having competent authority to make them; then, as I shall presently show, there is neither judicial nor legislative power which can ever disturb them; but they must stand irreversible and final. Let us then give these positions a careful and candid consideration.
Is it true that immediately upon the reestablishment of the civil authority and termination of the military, on the 26th day of January, 1870, every office filled by military appointment became vacant instanter ? Is this true, in fact and in law ? It will aid the solution of this question, to recur for a moment to the peculiar circumstances under which the civil rule was restored and the military government was terminated. It is a part of the current, public history, of which this court may judicially take notice. It wdll be remembered that while this State was subjected to the military authority of the United States, all the executive and judicial officers of the State were removed, and their places filled by the appointees of the military governor. These military appointees were filling all these offices, and exercising their respective duties and functions, on the day when the civil government was restored and the militaiy government terminated, to wit, on the 26th day of January, 1870. On that day there was a Governor, Lieutenant-Governor, and Attorney-General, who had been elected under the present constitution. A Legislature had been elected. But no judicial officers had been appointed under the new government, nor could be, because the constitution provided for their election by the Legislature, or by the people. The organization of the State government was not then perfected. The legislative department was alone complete. The executive department had its chief officers but none of its subordinates. The judicial department was wholly unorganized. On that day there was not a *38 single judge, or sheriff, or justice of the peace, or ■Commonwealth’s attorney, constable, commissioner of revenue, notary public, or clerk of court, appointed under the new civil government; and all the various- and important functions of these offices, affecting all the multiform interests of society, had either to be performed by the persons then filling them, or were not to be performed at all. In point of fact, the incumbents remained in their respective offices until their successors were appointed and qualified. If they had not so remained, there would have been a period of many months, when there was no judge to award a writ of habeas corpus, no clerk to issue a marriage license or record a deed, no justice of the peace to issue a warrant of arrest, no sheriff or constable to arrest a felon, no jailor to secure a prisoner, no superintendent of a penitentiary to receive a convict. Instead of the restoration of civil government, there would have been the annihilation of all government, with anarchy reigning supreme, blow, what was the duty (to say nothing now of the right; of that I shall speak presently) of these officers, thus circumstanced? Was the judge (before his successor under the new government was appointed) to leave his high place, refuse to discharge its functions, so vital to the interests and peace of society, to the protection of the liberties and security of the properly of the citizen ? Was the clerk to close his office, and leave the records of courts and all the muniments of title to be destroyed? Were sheriffs to stop enforcing executions and collecting the public revenues? Were jailors and keepers of penitentiaries to leave their posts, and let prisoners starve or escape ? Were public archives and public libraries to be abandoned and left to destruction because there was no auditor or secretary of the Commonwealth to preserve them? Was marriage to be inhibited, or made a crime, because there was no clerk to issue a *39 marriage license? Was an innocent man to be hung because there was no appellate judge to award a writ of error ? All these, and a thousand other appalling consequences, would have inevitably resulted from the sudden and absolute vacation of all the executive and judicial offices of the government. And, if the question had been free from doubt, if it had been certain that the restoration of the civil rule, by the approval of the constitution and the admission of senators and representatives by the Congress of the United States, had the unquestioned effect to remove from office, instanter, every appointee of the military government, they might even then have hesitated, in the face of these inevitable and appalling consequences, to retire before their successors were appointed and qualified to take their places. But the question as to their power to hold over was not free from doubt. It was a question about which there was much discussion in the community, and an honest difference of opinion among the most enlightened citizens of the State. It was the subject of excited and embittered litigation and earnest discussion in this court; and the Legislature itself, in assigning its reasons for the passage of the “ Enabling Act,” sets forth in its preamble the .“grave doubts” which had arisen as to the validity of the acts of these officers, “ performed since the admission of the State,” and as to their right to continue in office. The schedule appended to the constitution of the restored civil government, which schedule, in its own language, was adopted “ in order that no inconvenience may arise,” prescribed that “ The several courts, except as herein otherwise provided, shall continue with like power and jurisdiction, both in law and in equity, as if this constitution had not been adopted, and until the organization of the judicial department under the constitution.” These judges might have referred, and no doubt did refer, to this schedule, as their authority to continue to *40 hold their offices until their successors were appointed. The Court of Appeals is certainly one of the courts referred to, as one that “ shall continue with like power and jurisdiction,” until the organization of the judicial department. What the true construction of this provision is, was then, and is still, an open question. It was not passed upon in the late cases of Dyer v. Bllyson, and Bell v. Chahoon. It was not necessary in those cases. The decision there was, that this provision of sche(lule did not apply to the Mayor’s court. Judge Moncure, delivering the opinion of the court, says: “ The courts referred to are courts of record, which the Mayor’s court is not. They are the courts whose organization is provided for by the sixth article of the constitution, concerning the judiciary department, or such of them as existed under the old constitution ; that is, the Court of Appeals, Circuit courts, and Hustings courts. These courts were to continue, except, &c., with like power and jurisdiction, in law and in equity, as if this constitution had not been adopted, and until the organization of the judicial department under this constitution.”
This provision of the schedule has not yet received a judicial construction. What is its-real scope, meaning and authority, is still an open question. And it is not necessary to the purposes of my conclusions that it shall be solved now. I refer to these things for the purpose of showingthat the judges of the late Court of Appeals were not naked usurpers, acting without color of authority, who continued to discharge the functions of an office from which they had been absolutely removed by the termination of the military authority. This unquestionably was not the case. They were, at least, in office under color of authority. If they had no express authority to continue in office after the restoration of the civil government, until their successors were appointed and qualified, if the schedule referred to conferred no such *41 authority, they had the right to hold these offices, and continue to discharge their functions, until their sueeessors were appointed, upon the principle of public necessity and convenience. In every organic change of government, whenever one government succeeds-another, the incumbents in office, in the absence of constitutional or legislative provision, must, ex necessitate rei, continue to hold and discharge the duties of their respective offices until their successors are installed. It is true they hold by sufferance only, the established government having the right and the power at any time to put an end to their authority by appointing others to take their places, in the mode prescribed by law. But until this is done, their official acts are as binding and valid as those of their successors. This is true and must be true, from the very necessity of the case, and upon the first of all principles of government, the great principle of Usalus populi.” For otherwise, as I have already shown, the sudden vacation of every office, leaving no person to perform their various functions, would produce such a state of anarchy as would destroy every vestige of civil government and uproot the very foundations of society. And it is fortunate for the peace of society and the security of private rights, in these Southern States, that the highest tribunal in this land, while it repudiates, as null and void, all acts of the Confederate government and State governments which were aimed at the overthrow of the authority of the United States, yet recognizes and holds to be valid and binding all the judicial acts, otherwise lawful, of courts established and organized under the authority of the Confederate government, or of the States composing that government. See opinion Ch. J. Chase in Texas v. White, 7 Wall, U. S. R. 700.
This court ought to be the last tribunal to repudiate this salutary principle. The peace of society, the security of private rights, the confirmation of title to real *42 estate, the validity of deeds, wills and contracts, the acts of guardians, executors, administrators, trustees, and other fiduciaries, the sanctity of marriage in this State, all depend upon the recognition of this principle, that the official acts of the actual incumbents in office are to be recognized as valid. This principle has always been recognized by this court to a certain extent. In the cases of Dyer v. Ellyson, and Bell v. Chahoon, already referred to, Judge Moneure, delivering the opinion of the court, says: “The incumbents of office at the time of an organic change of government, continuing to hold over after such change (in the absence of a provision of the new Constitution, or of an act of the Legislature of the new government giving them such authority), hold by sufferance only, and upon a principle of public necessity and convenience,” &c. blow, it would be idle to say that such incumbents hold over upon the high principle of public necessity and convenience, and yet that all their official acts are void; that they are entitled to remain in the office, but are not permitted to discharge any of its functions. This is a solecism in law and reason which cannot be entertained for a moment. It seems to me that the soundness of these views cannot be questioned upon candid enquiry.
But if I am wrong in this view of the subject, certainly and beyond all controversy, the Judges of the late Court of Appeals must, at least, be considered judges de facto, after the 26th of January, 1870; and if they were officers de facto, then, upon the unquestioned- and uniform authority of the decisions of the English and American courts, their official acts must be held to be as valid and binding, so far as the public and the rights of third parties are concerned, as if their title to the office had been unquestioned and perfect. ~Were they, then, officers de facto ? The distinction between an officer de jare, one who is de facto *43 such, and a mere usurper, is well known and clearly settled; and these distinctions are important to be borne in mind. An officer de jure has the legal title to, and is clothed with all the power and authority of, the office. He has a title against the world to exercise the functions of the office, and receive the fees and emoluments appertaining to it. He is responsible to the government and injured parties, when he abuses his trust or transcends his authority. But his acts, within the scope of that authority, cannot be questioned by the citizen or any department of the government. Black. Tax Titles 92; 14 Yerm. B. 428.
An officer de facto is one who comes in by the power of an election or appointment, but in consequence of some informality or omission, or want of qualification, or by reason of the expiration of his term of service, cannot maintain his position when called upon by the government to show by what title he claims to hold his office. He is one who exercises the duties of an office under claim and color of title, being distinguished, on the one hand, from a mere usurper, and on the other, from an officer dejure. Ib.; 5 Eng. C. L. R. 278; 5 Wend. R. 234.
A mere usurper is one who intrudes himself into an office which is vacant, or ousts the incumbent without any color of title whatever. Black. Tax Titles 93; 7 New Hamp. R. 140.
Lord Ellenborough gave the following description of an officer de facto, which has been adopted by the courts and by text writers as “ accurate and expressive :” “ An officer de facto is one who has the reputation of being the officer he assumes to be, and is yet not a good officer in point of law.” 6 East. 368. According to this definition, and to the distinctions referred to, the judges of the late Court of Appeals, holding over after the restoration of the civil government (upon the assumption that it was without autho *44 rity), were certainly judges de facto. They were not usurpers, who intruded themselves without color of - title into offices .which were vacant. They unquestionably, in the language of Lord Ellenborough, “ had the reputation of being the officers they assumed to be.” Being in office under the authority of the laws of Congress, and continuing to hold over after these laws became inoperative, and claiming the right to exercise, and actually exercising the functions of their office, they are, within the very definitions of the authorities, officers de facto, acting colore officii. I conclude, therefore, that upon principle and authority, the decisions which we are called upon to review are at least the judicial acts of judges de facto. And I understand the rule of law (established by a uniform course of decision from a very early period to the present time), to be, that the official acts of an officer de facto, when they concern the public or the rights of third parties, are as valid and effectual as though he was an officer de jure. Says a modern text writer on this subject: “ The interests of the community imperatively require the adoption of such a rule. The affairs of society could not be conducted upon any other principle; without it, there would be an entire failure of justice. To deny validity to the acts of such officers, would lead to insecurity in public as well as private affairs, and thus oppose the true policy of every well-regulated State.” Black. Tax Titles.
This doctrine of the validity of the acts of officers de facto has been established from the earliest period, and repeatedly confirmed by an unbroken current of decisions down to the present time. In Sir Randolph Crew’s case, Oro. Oar. 97, a commission to take testimony executed by judges after the demise of James I., wffien their terms of office had expired, was held good, the court saying that “no inconvenience could arise on such proceedings; but, otherwise, it would draw in *45 question many trials at nisi prius, and trials and attainders, upon jail delivery, whereupon divers have been arraigned and executed since the king’s demise.”
In Harris v. Jays, Cro. Eliz. 699, it was conceded by the court, that if one being created bishop, the former bishop not being deprived or removed, admits one to a benefice upon a presentation; this is good, and not avoidable; for that the law favors one in reputed authority. In Knight v. The Corporation of Wells, Lutwyche 508, it was held that, “ if one elected as mayor of a corporation, without being legally qualified to be chosen to that office, after such election, puts the seal of the corporation to a bond, this obligation is good; because, by coming into the office by color of an election, he was thereby mayor de facto, and all judicial and ministerial acts done by him are good.” See also Leak v. Howel, Cro. Eliz. 533; King v. Lisle, Andrew’s R. 163; 2 Strange R. 1090. The same principle has been uniformly adopted in modern Knglish cases. It was distinctly acted upon in The King v. the Corporation of Bedford Level, 6 East. R. 356, 366; and in the more recent case of Margate Pier v. Hannam, 5 Eng. C. L. R. 278, where a statute providing for the appointment of justices of the peace declared that no person should be authorized to act as a justice unless he had taken certain oaths, it was decided that the acts of a justice, appointed under that law, were valid, although he had not taken the oaths required by the statute. Indeed, the doctrine in these cases is universally applied in England to officers de facto, from the lowest officer up to the king. 1 Black. Com. 204, 371; 1 Hale’s P. C. 60.
The same principles have been repeatedly adopted by the courts of this country; and there is not a single decision to the contrary. In the People v. Collins, 7 John. R. 549, Chancellor Kent observes that the point, “ that the official acts of officers de facto are valid,” *46 was too well settled to be discussed. In Wilcox v. Smith, 5 Wend. R. 231, tbe court says: “ Tbe principle well settled, that the acts of officers de facto are as valid and effectual, when they concern the public, or the rights of third parties, as though they were officers de jure.”
In Smith v. The State, 19 Conn. R. 493, the court uses this language: “ Eo principle of law is better settled, f^ari that public officers de facto, acting colore officii, are held to be as well qualified to act , while they remain in office, as if legally appointed and duly qualified.”
In Plymouth v. Painter, 17 Conn. R. 585, where the whole subject was most elaborately examined, it is said “ The acts of a de facto officer, whether ministerial or judicial, are valid, so far as the public or third parties having an interest in such acts are concerned; and neither the title of such officer nor the validity of such acts can be indirectly called in question in a proceeding to which he is no party.”
In South Carolina and in Illinois it has been held that where a law, under which a judge was appointed, was unconstitutional, and therefore his appointment was void; yet acts done by such judge were valid and binding. 2 So. Car. R. 696; 24 Illi. R. 184. In State v. Bloom, 17 Wisc. R. 521, where a judge had been actually ousted on a quo warranto, and a party sentenced to the penitentiary by him, while illegally in office, had been discharged on habeas corpus after the judgment of ouster on quo warranto, the Supreme court reversed the decision of the court below, (discharging the prisoner) and remanded him to the penitentiary, on the ground that the acts of the judge de facto were good against all the world, although he had been afterwards regularly pronounced not to be legally in office.
Cases illustrating the principle contended for might be multiplied to almost any extent. I refer only to the following, in further illustration of this well settled *47 rule of law; 66 Eng. C. L. R. 686; 5 Eng. L. & Eq. R. 60; 3 House Lds. R. 418; Tucker v. Aiken, 7 N. Hamp. R. 113; Jones v. Gibson, 1 New Hamp. R. 266; McInstry v. Tanner, 9 John. R. 135; Fowler v. Bebee, 9 Mass. R. 231; Burke v. Elliott, 4 Ired. R. 355; Gilmore v. Holt, 5 Pick. R. 258; 4 Zab. R. 409; 2 Metc. Ky. R. 493; 48 Maine R. 79.
This court has adopted the principles of these cases, some of which are cited in the opinion of the court, approvingly, in Monteith’s case, 15 Gratt. 172, in which it was decided that the acts of a sheriff de facto are valid, and cannot be enquired into in a collateral proceeding to which he is not a party; and the Legislature of this State recognized the same principle of law when they enacted the 7th section of ch. 12, Code 1860, p. 101, concerning disabilities to hold office. § 7, “All judgments given, and all acts done, by any person by authority or color of any office or post, or the deputation thereof before his removal therefrom, shall be as valid as they would be if this chapter had not been enacted.” In a late case decided in this city, “In re Griffin,” where a prisoner had been discharged upon habeas corpus, upon the ground that he had been tried and sentenced to the penitentiary by a judge who was disqualified from holding office under the 14th amendment Constitution United States; upon appeal to the Circuit court held by the Chief Justice of the United States, he was remanded to prison. In that case the Chief Justice, after citing approvingly the cases of Taylor v. Skrine, 2 Brev. R. 696; State v. Bloom, 17 Wisc. R. 521, and Ballou v. Bangs, 24 Illi. R. 184, already referred to above, and which he says cover the whole ground, both of principle and authority, then proceeds to observe, “This subject received the consideration of the judges of the Supreme court at the last term, with reference to this and kindred cases, in this district, and I am authorized to say, that they unani *48 mously concur in the opinion, that a person convicted by a jury and sentenced in a coui’t held by a judge de facto, acting under color of office, though not de jure, and detained in custody in pursuance of his sentence, cannot be properly discharged upon a writ of habeas corpus.” Law Times (U. S. Cts.), p. 100.
In a still more recent case, decided by the Circuit court of the United States in this district, Chief Justi°e Chase presiding and delivering the opinion of the court, the same general doctrine was recognized, and in such form that it has peculiar application to the cases before us. A suit for malicious prosecution, brought by Woodson against two members of the common council and sergeant of the town of Harrisonburg, had been removed from the Circuit court of Rockingham to the Circuit court of the United States. The only question was, whether the last-named court had jurisdiction to hear and determine the case? and that depended upon the further question, whether the an-est complained of was made by virtue of a militai’y order, or by the common council and sergeant, under their authority as corporation officers? The Chief Justice, delivering the opinion, says: “It is to be boi’ne in mind that the members of the common council of Harrison-burg had been elected to that office while the insui’gent government of "Virginia was in entire control of that portion of the State. When that government was dispersed by the superior force of the United States, the civil authorities did not necessarily cease, at once, to exist. They continued in being, de facto, chai’ged with the-duty of maintaining order, until superseded by the regular government. Thus, the common council of Harrison-burg remained charged with the government of the town, notwithstanding the temporary occupation of the place by the United States forces. Doubtless it might be superseded; but it was not superseded.” And so, it may be remarked in passing, before leaving this *49 branch of the subject, that the judges whose decisions we are now called upon to review, remained charged with the duties of their office until superseded by the regular government. Doubtless they might have been superseded at any time by the Legislature; but they were not; and though they were sitting every day as a court of Appeals, from the 11th day of January till the 25th day of February—sitting, indeed, in the same building with the Legislature—no action was taken to put an end to their authority; but, on the contrary, there was an express recognition by the Legislature of their existence as a court, in the fact that a resolution was adopted by that body removing one of their number upon the ground that he held an office under the government of the United States. I barely allude to this as a matter worthy of notice, without taking time to comment upon it.
I have thus traced the decisions of the English and American courts, from a very early period down to the present time, and there is one unbroken current of authority establishing the principle that public officers de facto, acting colore officii, are held to be as well qualified to act while they remain in office as if legally appointed and duly qualified. This being firmly established, both upon principle and authority, it follows that the decisions of the late Court of Appeals are valid, judicial acts. Being thus valid, has this court any power to review them ? If not, has the Legislature the constitutional authority to confer that power upon this court?
In the-cases before us, motions had been made in the court which pronounced the decisions for a rehearing, which motions were overruled and the final decrees entered; the mandate of the court was issued, the controversy was closed, and the rights of the parties had rested under these decisions. Has this court, independent of the act of assembly, any power to reopen them ?
*50 It is now the well-settled law of this State, that the Court of Appeals cannot review the decisions rendered at a former term. After its term has closed, its adjudications, right or wrong, must stand irreversible and final, and the controversies between the parties whose rights have been adjudicated are closed forever. This doctrine has been firmly established by this court, in the case of “Reid adm’r v. Strider,” 7 Gratt. 76. Judge Baldwin, delivering the unanimous opinion of the court in that case, says: “ This court is the appellate forum, in the last resort, for the revisal of the judgments and decrees of subordinate tribunals, which it . 7 may affirm or reverse, with power, m case of reversal, to render such adjudication as the inferior court ought to have rendered. During the same term its decisions, like those of other courts of record, are within its own breast, and may be modified or rescinded as a more matured consideration may dictate; but after the end of the term, the merits of its adjudications have passed beyond its control. This finality and irreversibility of the judgments and decrees of this court is inherent in the very nature and constitution of the tribunal, and cannot be disturbed without deranging the administration of justice and the introduction of intolerable evils in practice. Ib. 81.
In accordance, then, with the principle of this decision, this court has no inherent power to review the decisions of the court that preceded it. Has the Legislature the authority to clothe it with any such power ? I think not. It is clear to my mind that such an attempt, upon the part of the Legislature, would be the exercise of judicial power, and therefore void. It is now too well settled to admit of serious dispute, that the legislative department can no more exercise judicial power than the judicial department can exercise legislative power. Bach is supreme in the exercise of its own proper functions, when acting within the limits of *51 its authority. The boundary line between these powers is plainly defined in every well-ordered government; and in this country it is now a well-established principle of public law, that the three great powers of government—the legislative, the executive, and the judicial—should be preserved as distinct from, and independent of, each other, as the-nature of society and the imperfection of human institutions will permit. That system which best preserves the independence of each department approaches nearest to the perfection of civil .government and the security of civil liberty.
I believe there is not a single State constitution in this country that does not adopt, as a part of its basis, this principle of separation and independence of the three great departments of government. The constitution of this State, copied in this respect from those which were framed by the wisest expiounders of the science of government, and which is the paramount law to all the departments, plainly limits and defines the powers of each. Article IE. of that constitution is in these words: “The legislative, executive, and judiciary departments shall be separate and distinct; so that neither exercise the power's properly belonging to •either of the others.”
Ho particular definition of judicial power is given in the constitution; and, considering the general nature ■of the instrument, none was to be expected. But the terms used are still sufficient to designate, with clearness, that department which should interpret and administer laws, from that department which should make laws. The former decide up>on the legality of •claims and conduct; the latter make rules upon which those decisions should be founded. The law is applied by the one, and is made by the other. Cooly’s Const. Limitations 92: “To declare what the law is, or has been, is judicial power; to declare what the law shall be, is legislative.” 7 John. R. 498. On general principles *52 those enquiries, deliberations, decrees or orders, which are peculiar to the judicial department, must in their nature be judicial acts. It may be difficult in some cases to point out the precise boundary line between legislative and judicial duties, and define what is judicial power, and what legislative. But it is well settled, that an act of the Legislature, directing a court to rehear a cause or to grant a new trial, or any legislative action which retroacts upon past controversies, is an invasion of judicial power, which is arbitrary and unconstitutional. In Merrill v. Sherburne, 1 N. Hamp. R. 199, it was held that “ an act of the Legislature, awarding a new trial, in an action which has been decided in a court of law, is an exercise of judicial power, and therefore unconstitutional.” In Burch v. Newberry, 10 New York R. 374, it was held that the Legislature had no power to grant to parties the right to appeal after it was gone under the general law. In Lewis v. Webb, 3 Greenl. R. 326, it was held that the Legislature had no authority to pass any act or resolve, granting an appeal or new trial in any cause between private citizens-Oh. J. Mellen, delivering the opinion of the court in that case, says (and I quote his opinion because it has peculiar application in this case): “ Can the Legislature set aside a judgment or decree of a judicial court, and render it null and void ? This is an exercise of power common in courts of law; a power not questioned ; but it is one purely judicial in its nature and its consequences. But it is urged that the resolve is-not liable to objection on constitutional grounds; that it goes no further than to authorize a reexamination of the cause ” (precisely what was urged in the cases before us), “ to empower one judicial court to review the proceedings of another judicial court, and thus to do complete and final justice to all concerned. It is true, the act does not, in terms, purport to transfer property directly from one man to another by mere legislative au *53 thority; but it professes to grant to one party in a cause which has been, according to existing laws, finally decided, special authority to compel the other • party, contrary to the general law of the land, to submit his cause to another court for trial, the consequence of which may be a total loss of all those rights •and all that property which the judgment complained of had entitled him, and all those claiming under him, to hold and enjoy; that is, it proposes to accomplish, in an indirect and circuitous manner, that which the existing laws forbid, and which, by a direct and legal course, cannot be attained.” In Hill v. Town of Sunderland, 3 Verm. R. 507, it was held “That a statute which allows an appeal from road commissioners, made before the passage of said statute, is unconstitutional and void.” The court in that case says : “ The truth is, there must be an end of strife somewhere; and where will it be, if not when a judgment is recovered, which is final by the laws then existing f Ib. 514. Professor Cooley, in his admirable work on “ Constitutional Limitations,” p. 94, says: “ Legislative action cannot be made to retroact on past controversies, and to reverse decisions which the courts, in the exercise of their undoubted authority, have made; for this would not only be the exercise of judicial power, but it would be its exercise in the most objectionable and offensive form; since the Legislature would, in effect, sit as a court of review, to which parties might appeal when dissatisfied with the rulings of the courts.” Cooley’s Const. Limit. 94-96 and note.
In further support of this doctrine, see, also, Atkinson v. Dunlap, 50 Maine R. 111; Miller v. The State, 8 Gill R. 145; Beebe v. The State, 6 Ind. R. 501; Lanier v. Gallatas, 13 La. An. R. 175; Stanisford v. Barry, 1 Aik. R. 321; and Inh. Durham v. Inh. Lewiston, 4 Greenl. R. 140.
These adjudications assert no new doctrine, but are *54 founded on the broad, primary principles of constitutional government, recognized as elementary principles by all writers upon constitutional law. By Sir William Blackstone, when he asserts, that “ in the distinct and separate existence of judicial power, consists one main preservative of the public liberty.” By Montesquieu, when he exclaims, “there is no liberty, if the power of judging be not separated from the legislative and executive power. The union of these two powers is tyranny.” By Mr. Madison and Mr. Jefferson, when the one pronounced such a union “ the precise definition of tyranny,” and the other “ precisely the definition of despotic government.”
Bor is the case of Caulder v. Bull, 3 Dall. R. 386,. decided by the Supreme court IT. S., and so much relied upon by the counsel of the petitioners, at all in contravention of these well-settled doctrines. “The decision in that case was placed upon the ground that it was the usage in the State of Connecticut so to legislate, which was taken as evidence of the fundamental law; it, at that time, having no written constitution. Mr. Justice Patterson, in his opinion, puts the case on that distinct ground. He held, the constitution of Connecticut was made up of usage, and it appeared that the Legislature had, from the beginning, exercised the power of granting new trials.” Smith’s Com. 529.
But the same court, the Supreme court of the H. S., has expressly recognized the doctrine contended for in this opinion, when it declared, in a more recent case, that Congress has no power to interfere with, or set aside, a judgment of that court. See Wheeling Bridge case, 18 How. U. S. R. 421.
I have already extended this opinion beyond its proper limits, and have only to add that the principles adopted, in the cases cited, have become settled constitutional law, and are universally recognized and acted upon as such, by all judicial tribunals in this eoun *55 try. They are found in the doctrines of learned civilians, and the decisions of able judges, without a single decision, or even dictum, to the contrary. They not only grow out of the letter and spirit of the constitution, but are founded in the very nature of a free gov- . ernment, and are absolutely essential to the preservation of civil liberty, and permanent security of rights. I conclude, therefore, that upon reason and authority : 1st. .That the decisions of the late Court of Appeals were valid, judicial acts; and, 2d. That, being valid, the act of the Legislature, authorizing this court to rehear and review them, “ to affirm, set aside and annul the same, as to this coui’t shall seem proper,” is plainly an invasion of judicial authority, which is unconstitutional and void.
Anderson, J.
These causes are, by consent, brought up together, upon a preliminary question which arises in both, as to the power of this court to supervise and control decrees pronounced by H. B. Burnham, W. Willoughby and O. M. Borman, claiming to be judges of the Court of Appeals of Virginia, after the military provisional government had ceased to exist and the constitutional civil government had been inaugurated.
Many important and interesting questions have been raised by counsel in argument, and numerous authorities adduced, which I do not deem it necessary to consider in deciding the question which has been submitted. In stating the reason, therefore, for my opinion, I shall confine myself to the single question, Has this court power to supervise those decrees ?
The act of assembly of 5th of March, 1870, expressly clothes the court with that power. It is essentially a healing and remedial act; healing, so far as it gives validity to the acts which have been done; and remedial, so far as it gives to parties who may have been aggrieved the means and method of redress.
*56 But it is contended that section 2, which confers the power claimed for this court, is contrary to the constitution of the State, and therefore null and void. The questions, whether it was wise, or in accordance with sound policy? Whether it was better, as a matter of expediency, to have submitted for a short space to an usurpation, and to allow an unlawful tribunal, consisting of three judges, claiming to be the Supreme court of Virginia, when the constitution then in force required that said court should consist of five judges, to make a final adjudication upon the rights of citizens ? Or whether sound policy, and a proper sense of legislative duty and fidelity, might not require intervention, for the protection of the citizen ? These were questions for the Legislature, and not for this court. And that assembly has, in its wisdom, considered and decided them in the act under consideration, which is a declaration, by the supreme legislative power of the State, how far those acts shall be valid and binding, and to what extent they shall not be. I come, then, at once, to the consideration of the main question, Is section 2 of the enabling act unconstitutional and void.
It is argued that it is, because it is a judicial act, and therefore contrary to article II of the constitution, which provides “that the legislative, executive and judiciary departments shall be separate and distinct, so that neither exercise powers properly belonging to either of the others.” Is this a judicial act? So far as it is involved in this motion, it appears to be purely remedial, and not judicial, because it does not decide upon the rights of parties. It only authorizes the Court of Appeals to decide upon them. If the legislation which is necessary for organizing the judiciary, defining its jurisdiction and confering upon it the necessary powers for the exercise of the judicial function, is not judicial, then this act is not judicial, unless its retrospective character makes it so. It is well settled' *57 that a law is not unconstitutional because it is retrospective in its terms. Sedgw. on Stat. and Const! Law p. 192. The obligation of contracts does not include • the remedy. Ib.
Sedgwick says: “ There are a large number of cases in which it would be very injurious to assert that the Legislature is incompetent to pass laws having a retroactive effect. Such are laws declaring valid, acts of official persons irregularly elected, altering and amending judicial procedure, &c. In these and many other cases, it is difficult to avoid giving the act a retroactive effect. Every such effect must, or may, influence injuriously some individual case. But the interests of the community are paramount.” Sedgw. p. 198.
But it is contended that it divests vested rights. If it is true, that an act which divests vested rights is unconstitutional necessarily, and void, no rights vested by the decrees in question, if they emanated from a tribunal which was not a court, either dejure or defacto. If this should be held to be the case, it is a conclusive answer to both objections; and there is no occasion to review the authorities which were cited, to show that it is a judicial act.
We will now consider the question, were those decrees pronounced by a then lawful court of Appeals of Virginia? Were the persons who pronounced them, then lawful judges, clothed with authority to pronounce them?
I purposely confine this enquiry to the time when those decrees were pronounced, which was subsequent to the 26th of January, 1870, when the acts of Congress, known as the reconstruction acts, had ceased to operate, by an express limitation contained in the acts themselves; when the provisional government was at an end, and all authority under it; and the constitutional government, which superseded it, had been inaugurated, and was then the existing lawful government *58 of the State, -and recognized as such by Congress and the federal authorities.
If they had this power, whence did they derive it? -^°t from the provisional government, for that did not exist. Hot from the commanding general, for he could not continue his own life. His authority was at an end, and their authority ceased with his. And so was it solemnly ruled by this court in the recent eases of Dyer v. Ellyson, and Bell v. Chahoon.
'F’rág® Moncure, the president, in announcing the unanimous opinion of the court, uses this language: U aillhority of the military commander of Virginia ceased when her representatives were admitted into Congress. And when his authority ceased, that of his appointees also ceased. It would be strange, if, after the principal ceased to have any authority, his subordinate agents should continue to have authority.” They, then, derived no authority from this source. Whence did they derive it ?
It is contended that the last clause of section 2 of the schedule to the constitution, continued them in office. If this be so, it is clear that their authority cannot be questioned. Let us examine and discover, if we can, what was the intention of the convention which ordained it.
In the construction of this schedule, it is our duty, fairly and faithfully, to carry out the intention of the Convention. It is a well-established maxim, that the object, and only object of judicial investigation in regard to doubtful provisions of statute law, is to ascertain the intention of the Legislature which framed the law. Sedgw. on St. and Const. Law 230-’31; 1 Kent Com. p. 468. With this as our guiding star, we will pursue our researches. The language of the clause is: “ The several courts, except as herein otherwise provided, shall continue with the like power and jurisdiction, both in law and equity, as if this constitution had *59 not been adopted, and until tbe organization of tbe judicial department of this constitution.” Did the framers of tbe constitution, by that language, intend to ■ continue tbe judges in office? Such would not be tbe literal interpretation of tbe language. “ Tbe several courts.” Does that mean tbe several judges ? If that was meant, it would have been more appropriate to have said, tbe judges, or all tbe judges, shall continue in office. But it does not say “in office.” Tbe language is, “shall continue with tbe like powers and jurisdiction, both in law and in equity.” That language is more appropriate to courts than judges. If it meant judges, it would have continued them, not “with like powers,” &c., but in office, until their successors were appointed and qualified. But this it does not do. It continues tbe courts with like powers, &e., “and until tbe organization of tbe judicial department under this constitution.” As much as to say, notwithstanding tbe important changes that have been made by this constitution, in'the judicial system, tbe same courts which are now in existence shall continue, with tbe powers and jurisdiction they now have, until tbe judicial system prescribed by this constitution shall be organized.
, But if it meant that tbe judges should continue in office until tbe judicial department, under tbe constitution, was organized, there was likely to have been two sets of judges at the same time, for tbe same court both invested with authority, tbe military appointees, by section 2 of tbe schedule, and tbe constitutional judges, by section 22 of Article VI. of tbe constitution, which authorizes them to discharge tbe duties of their office from their first appointment and qualification. IsTow, it is obvious, upon tbe construction contended for, that if their appointment and qualification were prior to tbe organization of tbe judicial department,, which might *60 have been, there might be two sets of judges, at the same time, to fill the same offices.
But, if they did not use the term “ courts ” as synonymous with judges, did they mean to include judges in it? That the several courts, and judges thereof, shall continue ? That would be very proper language, and it shows that there is a difference between the terms courts and judges—that they convey substantive and distinct ideas. But they did not say the courts and the judges thereof, which they should and would have said, I think, if they meant to have continued the judges in office. To construe the language as including the judges, would also be equally repugnant to the 22d section of Article YI. of the constitution.
But I think we cannot be at a loss to know what they did mean, by the language they have employed. It has an exact meaning. Substantially the same language is used in the constitution of 1830, and in the constitution of 1851, with the same meaning in both: and in neither of them was it understood or intended to continue the judges in office. The language in the constitution of 1830, last clause of article YU, Code of 1849, pp. 44-5, is: “ All the courts of justice now existing shall continue, with their present jurisdiction, until and except so far as the judicial system may or shall be hereafter otherwise organized by the Legislature.” It is evident that this clause was not understood nor intended, by the eminent men who framed that constitution, to continue the judges in office, because they had previously, in article Y, sec. 2, expressly provided that the judges should remain in office until the termination of the session of the first Legislature, elected under this constitution, and no longer. It is clear, then, that the framers of that constitution did not understand the clause, that continued the courts, as continuing the judges. The framers of the constitu *61 tion of 1851 understood it as they did. Sec. 15 of the schedule, Code of 1860, page 58, has this clause: “ All the courts of justice now existing, shall continue with their present jurisdiction, until and except so far as the judicial system may or shall he otherwise organized.” This seems to he an exact copy of the clause contained in the constitution of 1830. Did the framers of the constitution of 1851 understand it as continuing the judges in office, or so intend it ? They evidently did not; for, in a previous section, the 13th, they had already provided for continuing the judges, and they continued them in office until such time as the law may prescribe for the commencement of the official terms of the judges, under the amended constitution, and no longer. I think we have in these two constitutions, which were framed by the representative men of Virginia, in successive generations, the sense in which the language in the clause under consideration has been understood and accepted in Virginia; and that it was not understood to continue the judges in office. And I think that the framers of the present constitution must be understood to have used it in the same sense, and that they did not intend by it to continue the judges in office.
There is another inference to be drawn from the action of the conventions of 1830 and 1851, to wit: that, in their opinion, a change of the organic law vacated all the offices which were held under it; and that, without express provision for continuing the incumbents in office after the new constitution went into operation, they could not continue to exercise the functions of their respective offices. This is clearly inferrable, from their carefulness to insert provisions in the constitutions they were forming, or in the schedule, for continuing all officers in office until their successors were appointed under the new constitution. Code of 1849, p. 44, art. VII; Code of 1860, p. 58, sec. 14 of sehe *62 dule. And the framers of the constitution of 1864 recognized the rule, by providing in section 4 of the schedule for continuing “ All executive, judicial and other officers” then in office, after that constitution ' went into operation.
Sow, can it be conceived that the framers of the Presen’*: constitution, with the three preceding constitutions in their hands, if they intended and desired to continue officers, would not have expressly provided for it in the constitution and schedule they were J framing. I can come to no other conclusion than that ttey did not intend it nor desire it.
And this conclusion is well supported by the historical fact, that, at the time the constitution was framed, the incumbents of the offices of the State were most obnoxious to the dominant power of the convention; and that the 4th clause of section 1 of article IH, and the 3d and 7th sections thereof, which they had inserted, but which were rejected by those to whom they were submitted for rejection or approval, would have rendered almost every incumbent of office in the State ineligible to office under the constitution which they had prepared. They also provided, by the election ordinance, for the speedy inauguration of the new government, and for filling the offices with new men immediately on the adoption of the constitution, thus making it not only unnecessary, but incongruous, that they should retain the provisions of the preceding constitutions for continuing the incumbents in office. But it is unnecessary to continue the argument further. I am convinced that the clause in question did not continue in office the judges of the Court of Appeals, appointed by Glen. Canbv, after their authority ceased as his appointees. I am of opinion, for the foregoing reasons, that the military appointees were not judges de jure when the decrees in question were pronounced.
But it is contended that they were officers defacto, *63 and that as such their acts were valid and binding, so that even the sovereign power of the State could not avoid or invalidate them. I deny that the acts of men, having no authority either from the State or the United States, are of such supreme and uncontrolable authority that they cannot be questioned or invalidated . by the sovereign power of the State, no matter how greatly and flagrantly the rights of the citizen, in his person or property, might have been invaded by them, or the public interests sacrificed, because they were, by technical rules, officers de facto. The great principle of salus populi would justify the State to interpose, by its sovereign power, to prevent their enforcement.
But an attempt has been made to show (I think unsuccessfully), that the Legislature has given the assent of the State to this assumption of authority. The only mode by which the Legislature can speak, is by resolution or bill. It has spoken by the enabling act, in the very clause which is sought to be annulled. Is there any evidence to be found, in any part of its proceedings, that this assumption of the judicial function by Mr. Burnham and his associates was with the assent or the approbation of the Legislature. I think not. On the contrary, its journals show that from the first assembling and organization of the two bodies, their authority Was questioned.
The assembly met on the 8th of February, and dn the 10th, the House of Delegates instructed their committee for courts of justice to enquire whether Mr. Burnham and his associates, who were then exercising the functions of judges of the Court of Appeals, were lawfully exercising that function. This would seem to have been a sufficient intimation to those gentlemen to suspend their proceedings until the question as to their right could be enquired into. This does not look like acquiescence on the part of the Legislature.
But it is said that the committee recommended that *64 Mr. Burnham’s seat should at once be declared vacant ou accoun^ of his ineligibility to office in Virginia under the constitution; which was done by the vote of both houses of the Legislature. And from this they draw the inference, that the committee and the Legislature acquiesced in the exercise of the judicial func^ion. This argument might be plausible if the record did not show that the committee, when they reported ^be foregoing recommendation, as to Mr. Burnham, expressly reserved the privilege of reporting thereafter as to the authority of his associates to exercise the jufunction. And if it did not further show that, as the result of all these proceedings, the enabling act was passed, and became the law of the State. It passed the House on the 26th of February, the day the decrees in question were pronounced, and received the aqiproval of the Governor on the 8th of March. We claim that this act, which is the final result and consummation of the proceeding instituted by the House only two days after the Legislature assembled, repels the idea of any acquiescence, by the Legislature, beyond the terms of the act itself. We claim that the assent of the sovereign power of the State was necessary to bind it, which could only be given by the legislative department; that the act in question is the only valid expression which has been given to the legislative will on that subject; and that only so far as the assent of the State has been given by that act, are the decrees in question binding. To hold otherwise, it seems to me, would be to wrest from the State one of its most important attributes of sovreignty, and would abrogate the 4th clause of article 1 of the constitution, which declares “ that all power is vested in, and consequently derived from, the people, and that magistrates are their trustees and servants, and at all times amenable to them.”
But I think, even upon the narrow view which has *65 been taken of this great question of State sovereignty, it cannot be shown that Mr. Burnham and his associates were even technically officers cle facto.
Upon what principle is it that the acts of de facto officers are binding? According to the old American idea, the right of government is founded in the consent of the governed. And the acts of the officers of government are binding, because they are the authorized agents of the people. Prom this it follows, that the only obligation of the people to submit to the authority of one man more than another, is, that he is the agent of the government or people.
Upon what ground, then, am I bound to recognize the authority of one who assumes to act officially, but who has no lawful authority from the people or their government? There must be some ground for it, other than that he has possession of the office; some ground upon which the de facto officer can be distinguished from the mere usurper. The only ground that I know of is, that he exercises the office under “ a claim and color of title,” by election or appointment—the only modes, where hereditary right does not exist, by which public offices can be conferred. It is not sufficient that he acts under a claim of right: for the usurper may do the same. There must also be color of right, by election or appointment.
In this view I find that I am well sustained by the books. Some authorities go farther, and require that he shall also have the reputation of being the officer he assumes to be—which implies that he is regarded and accepted by the public as a valid officer. In the ease of Tucker v. Aikin & al., 7 N. Hamp. R. 113, 140, Judge Parker defines an officer defacto to be “ one who, under color of an election or appointment, has the reputation of being the officer he assumes to be, but is not a good officer in point of law.” This agrees with Chief Justice Ellenborough’s definition, in Rex v. The *66 Corporation of Bedford Level, 6 East. R. 356, except that ^e, living in a country where offices were acquired by hereditary right, does not restrict the claim and color 0f title to election or appointment.
The claim of title may not be valid, but that cannot be known until it is ascertained in the mode prescribed by law And as he is in possession, under a claim and color of title, by election or appointment, accepted by the public as valid, it is the duty of all to recognize his official character, and to submit to his authority until J it is legally determined that he is not a lawful officer.
And this the good order of society, and security to person and property, require. Blackwell, in his work on Tax Titles (p. 92), speaking of an officer de facto, says: “He is one who exercises the duties of an office under claim and color of right, being distinguished, on the one hand, from a mere usurper, and on the other, from an officer de jure. The mere claim to be a public officer, or the performance of a single, or even a number of acts, in that character, will not constitute an officer de facto. There must be some color of a claim, under an election or appointment, or an exercise of official functions, and an acquiescence, on the part of the public, for a length of time, which would afford a strong presumption of a colorable right.” That is of an election or appointment. All the books, so far as I have had opportunity to examine them, agree in this, that the “ claim and color of title ” must be predicated of an election or appointment. The King v. Lisle, Andrews R. 172. How, what are we to understand by “claim and color of title?” Oases involving questions of adverse possession of land, “which is nothing more nor less than a possession under a claim and color of title,” may throw light upon it. Blackwell on Tax Titles (p. 566), says, “to repel the presumption of holding under, or in privity with the title of the true owner, it is essentially necessary that the tenant *67 of the freehold should show a possession under a claim and color of title—under an apparent right.” Again, on next page, “ anything which clearly defines the extent of the claim which professes to pass the land, and •is not obviously defective, will constitute the basis of an adverse possession.” In Moore v. Brown, 11 How. U. S. R. 414, one of the grounds upon which it was held that the defendant was not entitled to the benefit of the limitation law was, that the deed under which he claimed to have held the adverse possession was void upon its face. It was a deed for a tax title, and recited •a sale of the land on December 9th, 1823; when, under the law, it could not have been made before December 15th. Judge Wayne, delivering the opinion of a majority of the court, said: “Being a void deed, possession under it cannot be said to be under color of title.”
In the case of Irving v. Brownell, 11 Illi. R. 402, the court goes still farther. It is held that, by the words “claim and color of title, made in good faith” (which are the words of the statute,) “must be understood such a title as, tested by itself, would appear to be good. Hot a paramount title, capable of resisting all others, but such a one as would authorize the recovery of the land when unattacked; as if no better title wTas shown—that is, a prima facie title.” Let us apply these principles.
We have seen that these gentlemen, when they undertook to decide these causes as judges of the Court ■of Appeals of Virginia, were not invested with the office by the constitution or schedule, and their office, ■under the military government, had expired. Could they claim,‘by color of title, under either ? Could they have maintained their right under the constitution or schedule, if no better title was shown? Would their title, as tested by itself, appear to be good ? Does the second section, continuing the, courts, give them a prima facie, or apparent right or title, to the office ? I *68 think not. Those questions have already been fully answered. I think any claim which may be set up for them under section 2 of the schedule, is “ obviously defective.” The “ deed is void upon its face, and possession under it cannot be said to be under color of title.” Indeed, if it is not void upon its face, to support a claim and color of title, it would be good to vest perfect title in them upon a quo warranto, because the-said section presents the whole case. This conclusion, I think, will be confirmed by the further examination of the subject.
Had they a color of right under the appointment by Gen’l Canby?9 We have seen that by the very terms of the reconstruction acts, the authority of General Canby, and of all his subordinates, ceased the instant that the State was admitted under the new constitution. If they performed any official acts after the act of Congress admitting the representatives of the State was-passed and became a law, they could only have been valid if performed before they had notice of that act. By authority of the case of Dyer v. Ellyson and Bell v. Chahoon, before quoted, the authority of the military commander of Virginia ceased, when her representatives were admitted into Congress; and when his authority ceased that of his appointees ceased also. “ It would be strange (said judge Moncure, speaking for the whole court) if, after the principal ceased to have any authority, his subordinate'agents should continue to-have authority.” I regard that decision of the highest authority to us. But if it were not, having united in the opinion ex animo, and seeing no error in it, I shall now adhere to it. They were military appointments, and designed only to be temporary: To continue only while the military held the sword over the civil power of the State. When the military supremacy over thé civil terminated, as it was to terminate by the express terms of the warrant which called it- into existence,. *69 the offices of these judges terminated necessarily, by the inherent principle of its tenure, and the terms of its creation. How, then, can it be held that their appointment could give them claim and color of title to the office after their term had expired, and the power which had breathed into them the breath of official life had itself expired? When the original induction into office is rightful, but the office has terminated, as the termination of the office deputy, by the death of his principal, he is not a de Jacto officer, if he holds over. Rex v. The Corporation of Bedford Level, 6 East. R. 356. These military appointees were, to every intent and purpose, as effectually fundi officio, after the expiration of the military power which had given them official life and being, as a deputy officer is by the death of his principal. Neither can reappoint or revive the office. The incapacity in the one case is as absolute as in the other.
I think the practice in England has been to ratify the acts performed by illegal officers, where public necessity required it, by acts of Parliament operating retrospectively. Hence the healing acts of Parliament.
As an instance of such legislation, I will mention the act of Parliament, after the restoration, ratifying and making valid all marriages solemnized during the Protectorate of Cromwell, which, by the laws of England, were illegal and void. 1 Bl. Com. pp. 439-40. The convention or assembly which restored Charles H. was not lawfully constituted, yet it sat for seven months, and legislated for the kingdom, and its acts were ratified and made valid by a subsequent Parliament. The act of ratification doubtless gave legality, quiet and ■security to all rights and titles, and to all the various interests and relations, in all the ramifications of society, which were affected by the legislation of the previous illegal Parliament. Doubtless that Parliament provided for filling most or all of the public offices of *70 the kingdom, and the appointees had been invested, and had performed various official acts, executive, judicial and ministerial, by virtue of those acts of an ■unlawfully convened Parliament, before the acts of ratification of 13 Car. II. ch. 7 and ch. 14, by which, operating retrospectively, they were all made valid. 1 Bl. Com. p. 151. Ho one seemed to have taken ground that the acts of the first Parliament, and of the officers who derived their authority mediately or immediately ^rom caald he sustained, because they were de facto. The concurrent opinion seemed to be that an act of ratification was necessary. After the revolution of 1688, the settlement of the government was made by an unlawfully-constituted assembly. But its acts were afterwards ratified and confirmed by a lawful Parliament, and have ever since been regarded as valid. 1 Bl. Com. p. 152. In neither of these memorable epochs in the history of Great Britain did the nation rely upon the authority of de facto officers for security to the government and people.
In our own State, as we have seen, when a change in the organic law was made, though made without any change of the body politic, and made peacefully, according to the forms of law, the invariable practice has been to insert a clause in the constitution, or schedule, expressly continuing the officers of the old government, under the new, until their successors were appointed by the new government. As to what has been the practice of the other American States, I am not informed.
But, whether there is any uniform or established rule on this subject, when a change of government is made, without any change of the State or body politic, and the officers of the old and the new governments are the official agents of the same body politic, or whatever that rule should be in such case, I think the case before us differs materially and radically from any that *71 existed in the changes of government referred to. This was not simply a change of the organic law, or government of the hody politic, in which the officers ■ under the old, and the officers under the new, are the official agents or trustees of the same State or hody politic. But it is the deliverance of the State from a government which was no part of the State or of the body politic: a government which was not Virginian, but which was outside of Virginia: a government which had been put over us, not by the body politic, but forced upon us by bayonets, by an outside power, and which was withdrawn when our civil government —the government of the body politic—was restored.
How, if it were true that, when a State changes its government—its organic law—the officers under the former government have a right to continue in office under the new until their successors are appointed, there are reasons for it which do not apply in this ease. It may be said that whilst the government has been changed, the body is the same; and that the officers of the government which has been abrogated are the official agents of the same body politic which has adopted the new government, and therefore may be regarded as officers de facto. This principle is recognized, and in fact asserted, by our bill of rights, which is now a part of the constitution, and as such binding upon us, in the declaration “that all power is vested in the people (that is, the body politic), and that magistrates are their trustees and servants, and amenable to them.” Constitution of Virginia, Art. I., clause 2. Can it be said that the military appointees were the agents or servants of the people of Virginia, and amenable to them ? To the contrary, they were the agents or servants of the military power which appointed them to office, and amenable only to it; a power which was independent of us and had no sympathy with us, and which, in its constitution and nature, was adverse to *72 civil government. To say that Mr. Burnham and his associates continued in the judicial office, under the civil government of the State, by virtue of their military appointment, or by color of their military appointment (which amounts to the same), is to extend the operation of the reconstruction acts beyond their own exPress limitation; for they expressly declare that they shall be inoperative after the representatives of the State are admitted to congress. If even I should feel obliged to recognize those acts of congress as binding, I would not supplement them, if I had the right to do so as a legislator, to continue the military government a day or an hour after the civil government was restored. Especially would I not do so by judicial construction. If they claimed to continue in the judicial office, under the restored civil government, under color of their military appointments, they claim under a deed “ which is void upon its face,” and are not, therefore, de facto officers. I conclude, therefore, that the military appointments could not give these gentlemen a claim and color' of title to continue in the judicial office, under the restored civil government, and that, therefore, they were not de facto officers. To this conclusion my mind is brought irrefragibly.
Ueither the Cæsar Griffin case, nor the case of John C. Woodson v. The Mayor and Council of Harrisonburg, is in conflict with a single position I have taken. In the former case, Oiesar Griffin had been tried, convicted, and sentenced to the penitentiary, by a court over which Judge Sheffey presided. An application to the Circuit court of the United States was made to release hinj, upon the ground that Judge Sheffey, at the time of the trial, was disqualified to hold the office by the 14th amendment. It was shown that Sheffey had been elected to the office by the Legislature of the restored government of Virginia, which had been recognized as the lawful government of Virginia, both by congress *73 •and the President; that he had held the office, and discharged the duties of the office, for two years or more; ■and that he never had been removed from the office. And Chief Justice Chase held that he must be regarded ■as an officer de facto until he was removed; and that, as such, his acts were valid. In my opinion, he was clearly an officer de facto, if not de jure, until ousted. And the reasoning of the Chief Justice is very conclusive. He was an official agent of the body politic, which Mr. Burnham and his associates were not; and he was in by regular election, by competent authority, for a term which had not expired, and, in the opinion of the Chief Justice, he was not ousted by the constitutional amendment until removed by proceedings, which were necessary to carry it into effect. I think there is no analogy between Judge Sheffey’s case and that of Mr. Burnham and his associates.
The other case was a suit by Woodson v. the mayor and some of the councilmen, and sergeant of Harrison-burg, in the Circuit court of Rockingham, and by an order of that court was removed to the Federal court. 'The question was, in that case, was it one of that class •of cases which could be removed, under the act of congress, from the State to the Federal court? The Chief •Justice decided that it was not, and remanded it to the State court. In the course of his opinion he says: “When that government (the government of Virginia, which he calls insurgent,) was dispersed by the superior force of the United States, the civil authorities did not necessarily cease at once to exist. They continued ill being defacto, charged with the duty of maintaining order, until superseded by the regular government.” I think the Chief Justice was well warranted in giving to these officers the character of de facto officers. I do not think that he would have erred if he had characterized them as officers de jure. They had been regularly inducted into office, and their terms were unex *74 pired; and the United States recognized them as such, though claiming the right to remove them. A little lower down the Chief Justice says, “the government of the United States was not hound to recognize any authority which originated under the rebel government. But it was not superseded. On the contrary, an order was issued, addressed to the citizens of Harrisonburg, Va., June 16th, 1865, by which the citizens were notified that the mayor and council of the corporation last in office, upon the resumption of their duties, will be sustained in all their acts, consistent with existing laws and proclamations of the government.” And the Chief Justice might have shown that, at a later date, the status of the public officers of the State was recognized by the government of the United States. The act of March 2d, 1867, section 3—the first of the series of the reconstruction acts—and the act of July 19th following, section 2—the third of that series—recognize the official character of our State officers, and consents to their continuing to discharge the duties of their offices, but subject to the authority of the military commander to remove them. At a later day they were all removed. A clean sweep was made; and in many counties important offices were made vacant and not filled. But until they were removed, they were .in by their first appointment, and, in my opinion, were not merely officers de facto, but were lawful officers, though it was in the power of the military to remove them at any moment. . They were characterized by Chief Justice Chase as officers de facto, and I am free to admit that, if Mr. Burnham and his associates had any such foundation for their claim to the office which they assumed, it would be conceded. But I think I have shown they had not.
The desolation and ruin to public and private interests which have been so graphically portrayed in argument; the uprooting of society from its foundations, *75 and “ the reign of anarchy supreme,” by the failure of the military judges, clerks, sheriffs, superintendent of the penitentiary, and other officers to continue in office, may be true if those offices could not have been filled by others. But I do not admit that there was not v power in the executive to have provided for any such emergency. And I feel sure that he would have provided for the public safety, and for the protection of the citizen, in his person and property, until the Legislature could have assembled. But admitting that there was a public necessity for any of these military appointees to continue to discharge the duties of the office, that would not make him an officer de facto. Public necessity may be and is a reason why validity should be given to the necessary acts of de facto officers. But necessity cannot make one a de facto officer who is not. There must be a claim and color of title by election or appointment; which implies by some body authorized, or presumed at least, to be authorized, to elect or appoint.
ISTor can the holding that they would be de facto officers, meet the necessity; because they were not bound to serve as defacto officers. They could not have been compelled to serve. Suppose that they had refused to be de facto officers, the holding that they would be de facto officers if they served, would not remedy the evil. But since they have acted, the public necessity which required it, though it cannot make them officers de facto, strongly appealed to the legislative power of the State to pass a retrospective act ratifying, as far as was proper, what they had done.
The Legislature has responded to this necessity, by passing what is called the Enabling act, by which it has ratified their acts, as far as in its wisdom it deemed it proper to do, with a just regard to the protection of private right. And, properly regarding the holding-over of the military appointees, as being generally *76 prompted by a feeling of public necessity, commendable in itself, it authorizes them to receive the fees of the office conferred by law, which otherwise they could not have received, even if they had been officers de facto. By holding that they are not officers defacto, no injury is done to the public interest, or to anybody: but a power of discrimination is given to the Legislature, when they pass upon their acts, to prevent wrong, and to protect the right. That power they have not abused. But, regarding the act which they have passed to this end as eminently wise and beneficent in its operation, I think we ought to sustain it, unless it is palpably unconstitutional.
On the other hand, if we undertake to disregard this act of the supreme legislative power of the State, we deny to our citizens the right to be heard, who complain that they have been grievously wronged by the decisions of self-appointed judges, who had no warrant or authority from the State, or the United States, to exercise the judicial function, but who presumed to do so, against their protestations, and, by decisions which the law gave them no authority to make, have divested them of valuable rights of property. "We forever close against them the door of relief, and compel them to submit to this wrong. The consequences of our decision maybe much wider and farther reaching. ¥e forever deny to the Legislature a power which, in the progress of events, may be essential to personal security and public liberty. I cannot regard a case unimportant which involves such consequences as these. But this court has the undoubted right to declare an
act of the Legislature unconstitutional, and, must do •so, when it is plainly contrary to the constitution, so that both cannot stand together. But it is a delicate power, and should never be exercised in a doubtful case. And so has it been repeatedly held by the courts.
*77 But one other point remains to he considered.
If the Legislature could have heen convened in time, it would have been competent (by authority of the cases recently decided by this court above referred to,) to have filled all these offices temporarily, until they could be filled in the mode prescribed by the constitution. And it might, I apprehend, have authorized them to be filled by the military appointees, whose authority had expiréd, if it had chosen to do so. But the Legislature could not be convened in time for this purpose. And there was a necessity that many offices should be performed. The good order and safety of society required it.
In this I cannot include the offices performed by the gentlemen who assumed to be judges of the Court of Appeals; for, it has been disclosed in the argument of this motion, that, in one of these eases at least, there was a formal protest made to their assuming jurisdiction or authority to try it; and, furthermore, that, before these causes were heard and determined, the authority which clothed them with the judicial ermine had virtually disrobed them, by plainly intimating that their authority had expired.
But there were other offices which could not be dispensed with, as we have seen, even for the short period which elapsed between the expiration of the military provisional government and the date of the Enabling act, which offices were performed by the military appointees. How, it seems to me, that if it were competent for the Legislature to have given authority to perform the acts before they were done, it would have power to ratify them after they were done. In the case of Thompson v. Lee County, 3 Wall. U. S. R. 327, it was held by the Supreme court, that if the Legislature possessed the power to authorize the act to be done, it could by a retrospective act cure the evils which existed, because the powers thus conferred had been *78 tion. irregularly executed. And subsequently, in the case of Beloit v. Morgan, 7 Id. 619; (see, also, Sedgw. on Stat. and Const. Law 192, 198,) the same court held that ratification by the Legislature, in the case of bonds issued by a corporation, is in all respects equivalent to original authority, and cures all defects of power, if such defects existed, and all irregularities in its execuSee, also, Sedgw. before cited.
I have cited instances where this power has been exercised by the British Parliament. Other instances might be mentioned; but these are sufficient.
It is true that Parliament is invested with powers which do not belong to the General Assembly of Virginia; but, whilst that is true, it does not, I think, impair the force of the illustration: for it is assumed that the Legislature was fully invested with power to have authorized the acts to be done, and, not having done so, the question is, can an after act of ratification make them valid ? If ratification by Parliament gives validity, it seems to me that the same is true as to an act of ratification by the Virginia Legislature; because, in both cases, it depends upon the power of either assembly to have first authorized the act, and not upon the extraordinary powers of Parliament which a State Legislature has not. Parliament has no more power to pass a retroactive law than the Legislature of Virginia has, though it has many other powers which the Legislature has not.
But, if it was competent for the Legislature to ratify the acts which had not been previously authorized, and make them valid, by a retroactive law, which I am strongly inclined to believe, though not necessary to be decided in this ease, it cannot help the appellees, inasmuch as the decrees in question have not been rati-fied by the act of the Legislature. The act in question, in effect, only allows them to stand, provided neither party applies to this court, within a limited *79 time, and upon the notice prescribed, to review them; and upon such application they are reversed. The Enabling act does not make valid the decrees in these ■ causes; and, consequently, the question as to the power of the Legislature to ratify them is not involved.
Erom the best reflection I have been able to give to this motion, and for the reasons given, I am of opinion that it is competent for this court to review the decrees in question, and that, therefore, the appellees’ objection ought to be overruled.